## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MPD RESERVE OFFICERS, et al.**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**CHARLES RAMSEY**<br><br>**Defendant** | **Case Number:**<br>**1:06CV01223HHK**<br><br>**Judge Henry H. Kennedy, Jr.**<br><br>**Next event:**<br>**Preliminary Injunction Hearing**<br>**August 16, 2006** |

### PLAINTIFFS' OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

The Plaintiffs, by counsel, hereby oppose the Defendant's Motion to Dismiss. The Defendant's emergency and proposed rulemaking, in addition to the *de facto* rulemaking contained in General Order 101.3 (March 28, 2006) (Pl.s' Ex. A) amounts to an unlawful deprivation of the inalienable rights of the Plaintiffs and the other members of the proposed Plaintiff Class. The Defendant's invasion upon the legislative functions of the Council of the District of Columbia is antagonistic and offensive to the separation of powers between the legislative and executive branches of government fundamental to our democratic system of government, and contrary to the express instructions and implied intent of the Council in promulgating D.C. Code § 5-129.51. This Court's exercise of its powers of declaratory and injunctive relief is appropriate in the determination of the Plaintiffs' rights and the rights of all Reserve Officers so similarly situated.

1.     **The Defendant's prohibition of collective bargaining violates the inalienable rights of all members of the proposed class.**

The Defendant wishes to obscure the real issues involved in its prohibition of collective bargaining by Reserve Officers.  By arguing, without any controlling authority in support, that the District of Columbia is not subject to the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, the Defendant ignores that the Act is predicated upon, and in the furtherance of, fundamental and inalienable rights of free speech and free association. The Defendant's citation to United States Dep't of Defense v. Federal Labor Relations Auth., 299 U.S. App. D.C. 189 (D.C. Cir. 1993) is misleading and improper, there is no suggestion within the opinion that "a public employer is not required to engage in collective bargaining absent legislation granting the employees the right to such bargaining."  Docket #11 at 8[1].  The case cited analyzes a duty to bargain within the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 *et seq.*, a statute not relevant or applicable to the issues herein, and the negotiability of issues within the collective bargaining process.  The employees, who were represented by a union, disputed management's assertion that certain matters were not negotiable.  The Court remanded the case to the FLRA because the record was too incomplete to permit judicial review.  Thus, the case actually affirms the principle that employees have the right to bargain collectively.  The other case, Metropolitan Washington Airports Authority Professional Fire Fighters Ass'n Local 3217, etc. v. United States, 294 U.S. App. D.C. 351, 959 F.2d 297 (D.C. Cir. 1992), is equally misleading.  There is no suggestion therein that any of the employees involved could not organize for collective bargaining purposes, the case is instead about a limitation of such rights to give certain employees "the same

---

[1] References herein to documents within the ECF docket use the ECF page numbers.

rights *and limitations* with respect to labor agreements as the Federal Aviation Administration and its Employees enjoyed on October 18, 1986". 959 F.2d at 299 [emphasis *sic*].

It need not be determined if the NLRA is applicable to the District of Columbia government or if Plaintiffs have a property interest in collective bargaining (Docket #11 at 8), because it cannot be denied that they have a protected liberty interest. The Supreme Court in Thomas v. Collins, 323 U.S. 516, 518 (1945)[2] provided a relevant analysis of the authority of a government agency to infringe upon fundamental rights of free speech and free association inherent in collective bargaining.

> The case has been twice argued here. Each time appellant has insisted, as he did in the state courts, that the statute as it has been applied to him is in contravention of the Fourteenth Amendment, as it incorporates the First, imposing a previous restraint upon the rights of freedom of speech and free assembly, and denying him the equal protection of the laws. He urges also that the application made of the statute is inconsistent with the provisions of the National Labor Relations Act, 49 Stat. 449, and other objections which need not be considered. For reasons to be stated we think the statute as it was applied in this case imposed previous restraint upon appellant's rights of free speech and free assembly and the judgment must be reversed.

323 U.S. at 518.

> The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. *Cf*. Schneider v. State, 308 U.S. 147; Cantwell v. Connecticut, 310 U.S. 296; Prince v. Massachusetts, 321 U.S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare United States v. Carolene Products Co., 304 U.S. 144, 152-153.

---

[2] Cited in Freund Baking Co. v. NLRB, 334 U.S. App. D.C. 141, 165 F.3d 928, 935 (D.C. Cir. 1999); Goldman v. Secretary of Defense, 236 U.S. App. D.C. 248, 734 F.2d 1531, 1536 (D.C. Cir. 1984).

For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, *cf*. De Jonge v. Oregon, 299 U.S. 353, 364, and therefore are united in the First Article's assurance. *Cf*. 1 ANNALS OF CONGRESS 759-760.

Id. at 529-530 [footnote omitted].

That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted. They cannot claim special immunity from regulation. Such regulation however, whether aimed at fraud or other abuses, must not trespass upon the domains set apart for free speech and free assembly. This Court has recognized that "in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." Thornhill v. Alabama, 310 U.S. 88, 102-103; Senn v. Tile Layers Protective Union, 301 U.S. 468, 478. The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly. Hague v. C. I. O., 307 U.S. 496. The Texas court, in its disposition of the cause, did not give sufficient weight to this consideration, more particularly by its failure to take account of the blanketing effect of the prohibition's present application upon public discussion and also of the bearing of the clear and present danger test in these circumstances.

Id. at 532.

The Defendant's blanket prohibition against organizing for collective bargaining

purposes is absolutely a deprivation of the Reserve Officers' rights of free speech and

free association.  The Defendant offers no suggestion that any legitimate government

purpose is furthered by the prohibition.  The Defendant will never be able to demonstrate

any "clear and present danger" that justifies a prohibition (and there is no suggestion of

any proposed regulation thereof by the Defendant, only an outright prohibition) of such

collective bargaining.  The Plaintiffs' deprivation of these civil rights is justiciable by this

Court under 42 U.S.C. § 1983.


2.     **The proposed injunctive relief shall not disrupt any lawful discretionary conduct by the Defendant.**

The Plaintiffs' proposed injunction offers no impediment to the Defendant's

administration of the Metropolitan Police Department and its Reserve Corps within the

existing limitations of his authority under law.  There is no suggestion within the

Plaintiffs' Complaint or applications for injunctive relief that the Defendant does not

have the authority to deploy or supervise Reserve Officers within the confines of the

discretion afforded to him under applicable law and regulation.  The Plaintiffs solely seek

to bar the Defendant from engaging in such legislative activity explicitly restricted by

D.C. Code § 5-129.51 and the District of Columbia Administrative Procedures Act, D.C.

Code § 2-501 *et. seq*.


a.   **The administration of the Metropolitan Police Department is a highly regulated activity and numerous functions of the Defendant, including maintaining the Reserve Corps, are ministerial and not discretionary.**

Specifically addressing the administration of the Metropolitan Police Department,

District of Columbia law clearly articulates the separation of powers between the

Executive and Legislative branches of the District of Columbia government as is inherent

in each of our country's various Federal, State and Municipal governments.

> In addition to the powers vested in them by law, the Council of the District of Columbia is hereby authorized and empowered *to make and modify*, and the Mayor of the District of Columbia is hereby authorized and empowered *to enforce*, under such penalties as the Council may deem necessary, all needful rules and regulations for the proper government, conduct, discipline, and good name of said Metropolitan Police force…

D.C. Code § 5.127.01 [emphasis added].

The Metropolitan Police Department is stringently regulated by numerous

provisions of District of Columbia law.  The Council of the District of Columbia has seen

fit to enact legislation regulating nearly every facet of the administration of the

Metropolitan Police Department.  D.C. Code provides strict guidelines as to the

subdivision of police districts within the city (D.C. Code § 5-101.02), the deployment of

police officers within these Patrol Services Areas (D.C. Code § 5-101.04), the

Department's requirements for appointment, promotion and assignment (D.C. Code § 5-

105.01), the requirement of an officer's probationary period prior to permanent

appointment (D.C. Code § 5-105.04), age limits, physical standards and educational

requirements of police appointees (D.C. Code §§ 5-105.07, 5-107.01, 5-107.02a), police

uniforms (D.C. Code § 5-111.01), the authority to make warrantless arrests and the

obligation to take police action for offenses occurring in an officer's presence (D.C. Code

§§ 23-581, 5-115.03) and limitations on use of force, interrogations and surveillance

(D.C. Code §§ 5-123.02, 5-125.03, 5-116.01, 5-133.19).

D.C. Code § 5-129.51 mandates the Mayor (and therefore, the Defendant, as his

subordinate) "*shall* establish a Metropolitan Police Department Reserve Corps ("Reserve

Corps") in the District of Columbia." [Emphasis added.]  This lack of discretion seems to

6

be lost upon the Defendant.  *See* Docket #10 at 5 (the Defendant's suggestion (or implied threat) that he or the Mayor somehow now have the option of "disbanding the Reserve Corps altogether.")

> **b.  The Actions of the Defendant run contrary to the express and implied intent of the City Council and the Defendant acts contrary to the public's interest in thwarting or circumventing the stated objectives of the Reserve Corps statute.**

Contrary to the assertions of the Defendant that "this case presents little more than Plaintiffs' policy disagreements with the MPD's decisions regarding the management of the Reserve Corps" (Docket #11 at 3-4), the Plaintiffs instead solely demand that the Defendant abide by the City Council's legislative mandate to effectively and efficiently maintain and administer the Reserve Corps, not destroy the program by unlawful rulemaking because of the Defendant's apparent personal animosity towards it.  Within his Opposition to the Plaintiffs' application for a preliminary injunction and his Motion to Dismiss, the Defendant expresses his unrelieved contempt for the Reserve Corps, as already evident within the new general order (Pl.s' Ex. A) and the emergency and proposed rulemaking (53 D.C.R. 4581), and for the legislation which authorizes the program.   The Defendant continues to falsely claim that Reserve Officers "are not sworn officers".  Docket #11 at 5.  *See also* Pl.s' Ex. A at 2 (Defendant's definition of "Sworn Member" and "Sworn Officer" excluding any officer who is not in full-time, paid employment), 53 D.C.R. at 4585, 4587-4589 (similarly implying that Reserve Officers are not "sworn").  But this attempt to diminish the legal stature of the Reserve Officers runs contrary immediately to the Defendant's own prior statements (*see* Pl.s' Ex. E ¶¶ 1,

10[3]) and statements contained within in the offending rulemaking itself.  (*See i.e.*, 53 D.C.R. at 4585 (Reserve Officers shall "[s]uccessfully complete all required initial Reserve Corps training prior to being administered the law enforcement officer oath of allegiance…"); 53 D.C.R. at 4588 (A Reserve Officer Level II shall "[a]ppear before courts or administrative tribunals as a sworn officer"[4]); 53 D.C.R. 4589 (A Reserve Officer Level I shall "[p]erform all of the duties and responsibilities of a sworn officer"); 53 D.C.R. at 4593 (A Reserve Officer is defined as "[a] volunteer, unpaid sworn individual…")).

The Defendant goes on to state that these evidently sworn Reserve Officers do not have the same authority as paid officers (Docket #11 at 12), but offers no statutory authority whatsoever which distinguishes the legal authority of a paid officer from an unpaid one.  *See* D.C. Code §§ 5-115.03 ("[i]f any member of the police force shall neglect making any arrest for an offense against the laws of the United States committed in his presence, he shall be deemed guilty of a misdemeanor"),  22-405 (enhanced penalty for assault upon or impediment of the official duties of "any officer or member of any police force operating in the District of Columbia"), 22-4505 (prohibitions against carrying concealed weapons "shall not apply to… policemen or other duly appointed law enforcement officers"), 23-581 ("[a] law enforcement officer may arrest, without a warrant" for any offense occurring in their presence).   None of these laws require either

---

[3] The Defendants' Answer to the underlying Complaint (Pls.' Ex. E) in the unpublished case referenced by the Defendant's Motion to Dismiss (Docket #11 at 9), Johnson v. Williams, 887 A.2d 1027 (D.C. 2005). The Defendants in that case, including the present Defendant, admitted that MPD Reserve Officer Johnson was a "sworn" officer "for the MPD for the District of Columbia with duties to uphold the laws for DC."
[4] If Reserve Officers are not sworn as the Defendant alleges, it would appear that the Defendant is suborning perjury by suggesting that Reserve Officers misrepresent this non-sworn status before a court.

paid employment or the Defendant's periodic authorization for a Reserve Officer's authority to become operative.

It is only the Defendant, setting out on his own unauthorized quasi-legislative agenda, who attempts to create such a distinction out of whole cloth. D.C. Code § 5-129.51, the Reserve Corps enabling legislation referenced by the Defendant, makes no limitation whatsoever upon Reserve Officers' authority. The statute in fact, provides that "any limitations on or restrictions to their authority and discretion" shall be made by the Mayor, not the Defendant[5], and that the Mayor's own authority to do so expired in early 2005. If in fact, Reserve Officers could not operate under the same statutory authority as the full-time officers, each and every one of their thousands of prior arrests would be invalidated and they could not perform the duties described within the offending rulemaking, *i.e.* 53 D.C.R. at 4589 (a Reserve Officer Level I shall "[p]erform all of the duties and responsibilities of a sworn officer"). No provision exists anywhere within District of Columbia law that permits the Defendant to temporarily give such authority to anyone not a sworn law enforcement officer. *But see* D.C. Code § 5-129.03 (the Mayor may appoint "special privates" temporarily in specified emergencies). Under District of Columbia law, police authority can only come from an individual's status as a sworn law enforcement officer. Either Reserve Officers are sworn law enforcement officers or they are not. The Defendant can not have it both ways.

The Defendant further states that Reserve Officers "are not subject to the civil service selection and training processes for sworn police officers." Docket #11 at 5. The Defendant's contempt for the City Council's mandate to maintain the Reserve Corps in

---

[5] In the process of drafting this legislation, that authority was specifically taken away from the Defendant and given to the Mayor and the above described time limitation was added. *See* Docket #2 at 7 and Pl.s' Ex. C as referenced therein.

the manner they directed is definitively palpable here.  D.C. Code § 5.129.51 states, in a passage addressed specifically to the Defendant, "[t]he selection criteria required for and training provided to members of the Reserve Corps shall be similar to the selection criteria required for and training provided to full-time, sworn police personnel."  The Defendant's statement above is, in and of itself, expressly insubordinate to the Council. The Defendant's intent to ignore this law is further demonstrated by the emergency and proposed rulemaking perpetuating a bifurcated selection and training system which predated the legislation, denying the majority of Reserve Officers training provided to paid officers and thus denying them "similar" training to paid officers.  *See* 53 D.C.R. at 4584 ("Reserve Officers Level II must meet the following appointment criteria for a Reserve Officer Level I…") and Pl.s' Ex. F.

The City Council made the following findings inherent in their promulgation of D.C. Code § 5.129.51:

First, contrary to the Defendant's false assertion that the economic benefits of the program are "unsupported" (Docket #10 at 4), the Council has found that it is in the public interest and to the public's benefit to maintain a standing force of Reserve Officers within the Metropolitan Police Department.  Half a century of public service is more than sufficient "support" of this point.

Second, the Council has found that such Reserve Officers should meet essentially the same standards of training and selection as the paid officers.

Third, the Council implicitly states there presently exist no limitations on the authority of Reserve Officers.

Fourth, the Council implicitly stated the Chief of Police had no authority to limit such authority of Reserve Officers; that authority was given to the Mayor and for a limited time.

Fifth and finally, if the Mayor saw fit to limit the Reserve Officer's authority, the Council expressly stated he had to do so within a specific period of time and within the confines of the notice and comment requirements of the District of Columbia Administrative Procedures Act.

A third-tier executive functionary, the Defendant now claims some superior authority to the Council sufficient to completely ignore this lawfully legislated statute and make his own findings and law.

It is always troubling that a government official believes himself to be above the law and that he may impose his own agenda upon an organization he has sworn to administer effectively and efficiently within the confines of the law.  That the offender is the chief law enforcement officer of the District of Columbia with thousands of armed personnel at his command is simply terrifying.  If tomorrow the Defendant decides that some other law, perhaps the Fourth Amendment to the U.S. Constitution, will no longer be afforded to the citizens of the District of Columbia, who will stop him?  He has already stated that the rights of Reserve Officers "are only such rights as the District chose to give them…"  Docket #11 at 8.   The Defendant explicitly states herein that he believes the Plaintiffs' other previously inalienable rights do not apply.

3.    **The Mayor's delegation of authority to the Defendant was without authority of the legislature and without effect of law.**

The Defendant offers an unnumbered exhibit (Docket #12 at 3) in support of his contention that his authority to engage in the offending rulemaking was authorized and delegated by the Mayor.  Mayor's Order 2006-57 appears to bear the signature of the Mayor and is dated May 19, 2006.  The document appeared in the D.C. Register on June 30, 2006.  53 D.C. Reg. 5313.

a.    **The authority delegated to the Defendant by the Mayor was greater than the Mayor's own authority and any re-delegation of authority by the Mayor specifically delegated to him was improper.**

The Mayor cannot delegate to the Defendant authority which he himself does not possess.  Smith v. Gober, 14 Vet. App. 227, 231 (2000); City Capital Associates Ltd. Partnership v. Interco, Inc., 696 F. Supp. 1551, 1556 (D. Del. 1988); In re White Motor Credit Corp., 23 B.R. 276, 279 (D. Ohio 1982); Health Care Equalization Committee of Iowa Chiropractic Soc. v. Iowa Medical Soc., 501 F. Supp. 970, 976 (D. Iowa 1980); Coral Gables v. Giblin, 127 So. 2d 914, 917 (Fla. Dist. Ct. App. 1961) (citing Brown v. Town of Eustis, 92 Fla. 931, 110 So. 873. (1926); Shiflett v. John W. Kelly & Co., 16 Ga. App. 91, 93 (1915); Blake v. Maine, 2005 Me. Super. LEXIS 54 (Me. Super. Ct. 2005) ("Its powers and responsibilities are entirely contained within statutory law. As a result, [the defendant] and its employees cannot take action or delegate any authority not specifically granted to it by the Legislature."); Feek v. Township Board of Bloomingdale, 82 Mich. 393, 408 (1890)("…it is true that a person or body intrusted with authority, and with the right to delegate the exercise of such authority to another person or body, cannot delegate a greater authority than such person or body possesses"); Sterrett v. Milk River

Prod. Credit Ass'n, 234 Mont. 459, 464 (1988) (quoting Stillman v. Fergus County, 220

Mont. 315, 317 (1986) ("A principal cannot delegate authority it does not possess")).

      Contrary to the Defendant's assertions that the Mayor could simply disregard the

instructions of the City Council to issue any rules it intended within the 180 day deadline,

the statute purposefully *limited the power* of the Mayor to conduct rulemaking as

described in Thomas v. Barry 234 U.S. App. D.C. 378, 379 n.5 729 F.2d 1469, 1470 n.5

(D.C. Cir 1984).   The D.C. Court of Appeals distinguished Thomas in 1987 from the

proposition the Defendant offers it now for good reason.

> The hospital's argument that a "statutory time period is not mandatory unless it
> both expressly requires an agency or public official to act within a particular time
> period and specifies a consequence for failure to comply with the provision,"
> citing Thomas v. Barry, 234 U.S. App. D.C. 378, 379 n.5, 729 F.2d 1469, 1470
> n.5 (1984), quoting Fort Worth National Corp. v. FSLIC, 469 F.2d 47, 58 (5th Cir.
> 1972) (emphasis in original), is not persuasive. Neither Thomas nor Fort Worth
> involved the deprivation of individual liberty.
>
> The language of § 21-525 is plain and clear; upon request, a hearing shall be held
> within 24 hours. As this court recently pointed out, use of the word "shall" creates
> "a duty, not an option." Dupont Circle Citizens Association v. District of
> Columbia Board of Zoning Adjustment, 530 A.2d 1163, 1170 (D.C. 1987).
> Congress could have required that a hearing be held within 24 hours where
> feasible, but it did not.

In re De Loatch, 532 A.2d 1343, 1344 n.2, 1344-1345 (D.C. 1987).  The Defendant's

offending rulemaking specifically sets out to limit the Plaintiffs' rights, authority and

privileges under District of Columbia law (and in the process, infringes upon their

Constitutional rights).  The Plaintiffs were entitled under D.C. Code § 5-129.51 to have

those rights defined by March of 2005, so they could determine if they wished to make a

continued commitment of time and effort to the program.  Unlike the petitioner in Spicer

v. District of Columbia Real Estate Comm'n, 636 A.2d 415, 418 (D.C. 1993) who did

"not claim that he has been prejudiced in any way by the delay", the Plaintiffs here

plainly demonstrate that they have been injured by the unjustified delay in this rulemaking.

The Mayor's authority to engage in rulemaking was limited for good reason and once the Mayor's authority expired, the Defendant could not be delegated authority which the Mayor himself did not have.  The Defendant's secretive attempt to change those rights over a year later pulled the rug out from under Reserve Officers who had already made a burdensome commitment.  These Reserve Officers made this commitment reasonably relying upon those terms set forth in the D.C. Code 5-129.51 and the Mayor's lack of timely rulemaking changing those terms.  Once again, there is no suggestion that the Defendant can not now make policy regarding the administration or supervision of the program (*see* Docket #11 at 15 (the Defendant's assertion that "the Reserve Corps would remain forever unregulated")) and decide his best use of the Reserve Officers (regardless of however ineffectively he has done so in the past), but he has never had a right to define *who they are* under law.

The Defendant asserts that it was appropriate under D.C. Code § 1-204.22(6) for the Mayor to re-delegate authority specifically delegated to him under D.C. Code § 5-129.51.  Docket #11 at 15.  "'*Delegata potestas non potest delegari*' - a delegated power cannot be delegated."  In re Santa Cruz, 446 P.2d 253, 255 (Ariz. Ct. App. 1968); Meadows v. American Eagle Fire Ins. Co., 104 W. Va. 580, 583 (1927) ("It is a maxim of the law that delegated power cannot be delegated; the delegate cannot delegate; he may use others in the accomplishment of particular transactions which he directs, but he cannot grant to the discretion of others that which was entrusted to his discretion"); New Orleans v. Sanford, 137 La. 628, 647 (1915) (citing Broom's LEGAL MAXIMS, § 385; 13

Cyc. 769; 28 Cyc. 276) ; <u>James v. Walker</u>, 147 Ky. 647, 650 (1912); <u>Territory ex rel.</u>

<u>County of Oahu v. Whitney</u>, 17 Haw. 174, 177 (1905); <u>Fairchild v. King</u>, 102 Cal. 320,

322 (1894) (quoting WHARTON ON AGENCY, § 709); <u>Dillard v. Webb</u>, 55 Ala. 468

(1876); <u>Doe ex dem. Davis v. Vincent</u>, 6 Del. 416, 425 (1857).  The legislative record

plainly demonstrates that the City Council considered, but specifically excluded, the

Defendant from rulemaking authority under D.C. Code § 5-129.51.  *See* Docket #2 at 7

and Pl.s' Ex. C as referenced therein.  The legislative intent is plainly evident within Pl.s'

Ex. C where the Defendant was excised from the draft of what would become D.C. Code

§ 5-129.51 and replaced with the Mayor.

> We do not subscribe to the District's proposition that legislative history can never
> be used to limit what may appear to be the plain language of a statute.  *Peoples*
> *Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en
> banc). Recently, however, apropos of the District's argument, we did reaffirm that
> this court "must first look at the language of the statute by itself to see if the
> language is plain and admits of no more than one meaning," for "the primary and
> general rule of statutory construction is that the intent of the lawmaker is to be
> found in the language that he has used." <u>Id</u>. at 753 (citations omitted).  Thus, "a
> court should look beyond the ordinary meaning of the words of a statute only
> where there are 'persuasive reasons' for doing so," <u>Id</u>. at 755 (citation omitted),
> such as the statutory language having only "superficial clarity" or, if literally
> applied, causing "absurd results," or creating an "obvious injustice," or violating
> the "legislative purpose." <u>Id</u>. at 754.

<u>Auger v. D.C. Bd. of Appeals & Review</u>, 477 A.2d 196, 210-211 (D.C. 1984).  *See also*

<u>Jubilee Hous., Inc. v. District of Columbia Water & Sewer Auth.</u>, 774 A.2d 281, 290-291

(D.C. 2001); <u>Lange v. United States</u>, 143 U.S. App. D.C. 305, 307, 443 F.2d 720, 722

(1971); <u>Harrison v. Northern Trust Co.</u>, 317 U.S. 476, 479, 87 L. Ed. 407, 63 S. Ct. 361

(1943).  It is plainly evident that the City Council specifically did not want the Defendant

to conduct rulemaking (and it now appears that their cause for such was well-founded)

and the Defendant's present employment of D.C. Code § 1-204.22(6) to circumvent the

legislative intent of the Council is an absolutely inappropriate abuse of the delegation of authority granted to the Mayor under the statute.

It is indeed an unfortunate state of affairs that the perpetuated ambivalence and/or absenteeism of the Mayor as is presently evident in the District of Columbia has prevented him from timely accomplishing the original mandate given to him by the Council and permitted these repeated violations of the law by the Defendant.

> **b. Any construction of D.C. Code § 5-129.51 which would grant the Mayor or the Defendant purely legislative authority exceeds the scope of permissible administrative rule making and violates fundamental laws of separation of powers.**

Legislative powers normally cannot be delegated.  St. Louis Consol. Coal Co. v. Illinois, 185 U.S. 203, 210 (1902); City of New York v. Clinton, 985 F. Supp. 168, 180 (D.D.C. 1998) *affirmed,* 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998); State ex rel. De Woody v. Bixler, 136 Ohio St. 263, 270 (Ohio 1940);  La Polla v. Board of Chosen Freeholders, 71 N.J. Super. 264, 278 (Law Div. 1961) (citing Lotspeich v. Morristown, 141 Tenn. 113, 124-123 (1918) ("The rule seems to be well settled that, so far as the powers of a municipal corporation are legislative, they rest in the discretion and judgment of the municipal body intrusted with them, and the general rule is that that body cannot delegate or refer the exercise of such powers to the judgment of a committee." [citations omitted])).  "The principle is a plain one, that the public powers or trusts devolved by law or charter upon the council or governing body, to be exercised by it when and in such manner as it shall judge best, cannot be delegated to others."  Hengst v. Cincinnati, 9 Ohio Dec. 730, 734 (Ohio Misc. 1898) (quoting DILLON ON MUNICIPAL CORPORATIONS (4th Ed.) § 96); Kugler v. Yocum, 69 Cal. 2d 371, 376 (1968) ("the

purpose of the doctrine that legislative power cannot be delegated is to assure that 'truly fundamental issues [will] be resolved by the Legislature' and that a 'grant of authority [is] . . . accompanied by safeguards adequate to prevent its abuse.' (Wilke & Holzheiser, Inc. v. Department of Alcoholic Beverage Control (1966) 65 Cal.2d 349, 369 [55 Cal.Rptr. 23, 420 P.2d 735]").  *See also* Local Div. 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority, 253 Ga. 219, 223 (1984) (cases cited therein exemplifying "the general rule that legislative power cannot be delegated unless expressly authorized by statute").

"However… the legislative branch has the authority to delegate to administrative boards and agencies of the state the power to ascertain and determine the facts upon which the laws are to be applied and enforced." State v. Taylor, 479 So. 2d 339, 341 (La. 1985).

> So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.

Id. (quoting Schwegmann Brothers Giant Super Markets v. McCrory, Commissioner of Agriculture, 237 La. 768, 112 So. 2d 606, *appeal dismissed*, 361 U.S. 114, 4 L. Ed. 2d 154, 80 S. Ct. 207 (1959)).  *See also* State v. Rodriguez, 379 So. 2d 1084, 1087 (La. 1980) ("[t]he legislature may confer ministerial powers upon executive agencies if it supplies adequate standards to execute the legislative policy; however it cannot surrender the legislative power itself to determine what the law shall be"); Trinity Medical Ctr. v. North Dakota Bd. of Nursing, 399 N.W.2d 835, 843 (N.D. 1987); Associated Industries of Oklahoma v. Industrial Welfare Com., 185 Okla. 177, 180 (1939); State v. Terwilliger,

141 Ore. 372, 381 (1932). "[L]egislation must contain adequate standards to guide and restrain the exercise of delegated administrative functions, including rule making; and that to avoid pure delegation of legislative power by creation of an administrative agency, the Legislature must set limits on such an agency's power and enjoin on it a certain course of procedure and rules of decision in performance of its function."

Commonwealth v. Sessoms, 516 Pa. 365, 384 (1987) Papadakos, J. *concurring* (citing Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County, 418 Pa. 520, 211 A.2d 487 (1965); Holgate Brothers Co. v. Bashore, 331 Pa. 255, 200 A. 672, 117 A.L.R. 639 (1938)); State v. Smith, 88 S.D. 76, 79 (1974); McQueen v. McCanless, 182 Tenn. 453, 460-461 (1945).

> The constitutional validity of such legislation depends upon what duties are delegated. The distinction between what duties may or may not be delegated has been drawn upon the ground that the legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or maintains to make, its own action depend.

Utah Light & Traction Co. v. Public Serv. Comm'n, 101 Utah 99, 130 (1941).

> In reviewing a claim of improper delegation of legislative power, we consider: "(1) Did the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?"

Tri-Nel Mgmt. v. Board of Health, 433 Mass. 217, 225 (2001) (citing Construction Indus. of Mass. v. Commissioner of Labor & Indus., 406 Mass. 162, 171 (1989) (quoting Chelmsford Trailer Park Inc. v. Chelmsford, 393 Mass. 186, 190, 469 N.E.2d 1259 (1984))). "…where a law embodies a reasonably clear policy or standard to guide and control administrative officers, so that the law takes effect by its own terms when the

facts are ascertained by the officers and *not according to their whim*, then the delegation

of power will be constitutional." <u>Richfield v. International Asso. of Fire Fighters</u>, 276

N.W.2d 42, 45 (Minn. 1979) (citing <u>Lee v. Delmont</u>, 228 Minn. 101, 113, 36 N.W. 2d

530, 538 (1949) [emphasis added]).

The District of Columbia Administrative Procedure Act provides for notice and

comment procedures for rulemaking within District of Columbia agencies, including the

Metropolitan Police Department, in such matters of specialized knowledge and

competence specific to a particular agency.  The purpose of administrative rulemaking is,

in part, to relieve the Legislature or Judiciary of time-consuming and repetitive cases

involving fact-intensive inquiries.  *See* <u>King v. District of Columbia Dep't of Empl.

Servs.</u>, 742 A.2d 460, 470 (D.C. 1999); <u>Drivers, Chauffeurs & Helpers Local Union No.

639 v. District of Columbia</u>, 631 A.2d 1205, 1217 (D.C. 1993); <u>Auger</u>, 477 A.2d at 206;

<u>In re Petition of R.M.G.</u>, 454 A.2d 776, 807 (D.C. 1982) Newman, C. J., *dissenting*.  It

does not give license to the Executive to re-write the law.  To suggest that D.C. Code § 5-

129.51 permits the Mayor or the Defendant to create a wholesale re-definition of the

authority of Reserve Officers within the District's existing statutory scheme runs

immediately contrary to the separation of powers between the Council and the Mayor as

clearly articulated within D.C. Code § 5.127.01 and the cases cited *supra*.

> **c.  The Defendant bears the burden of demonstrating an emergency
>     which justifies the present emergency rulemaking.   He has failed to
>     do so.**

The Defendant offers no evidence that any emergency existed that the offending

rulemaking is or was necessary for the immediate preservation of the public peace,

health, safety, welfare, or morals.  D.C. Code § 2-505(c).   There exists no authority in support of the Defendant's bald assertion that

> …the Court should defer to the determination of the Executive Branch that an emergency situation existed.  This is particularly true in the area of police work and public safety.

Docket #11 at 13-14.  To the contrary, an agency determination of an emergency justifying emergency rulemaking under D.C. Code § 2-505(c) must be "supported by substantial evidence in the record".  <u>Hobson v. District of Columbia</u>, 304 A.2d 637, 638 (D.C. 1973).  It is the proponent of the rule, the Defendant herein, that has the burden of proof in justifying this alleged emergency.  D.C. Code § 2-509(b).  It is the Defendant who has created an emergency requiring immediate injunctive relief by creating repeatedly self-contradictory and unlawful rules that can never be harmonized with existing law.  This Court has previously granted summary judgment to the opponent of emergency rulemaking when the District of Columbia provided no evidence that an emergency existed justifying the emergency rulemaking.  <u>Wheelchair Carriers Ass'n v. D.C.</u>, Civil Action No. 00-1586 (GK), 2002 U.S. Dist. LEXIS 4617 (D.D.C. 2002).


### d.  Where the Defendant has exceeded his authority in rulemaking, immediate declaratory and injunctive relief is appropriate.

Where the Defendant has acted *ultra vires* and without justification to employ emergency rulemaking, it is appropriate for this Court to make an immediate inquiry and offer immediate relief.

> There can be cases where an agency clearly appears, on the face of the record, to exceed its jurisdiction. Thus, "no court requires exhaustion when exhaustion will involve irreparable injury and when the agency is palpably without jurisdiction."

Auger v. D.C. Bd. of Appeals & Review, 477 A.2d 196, 206 (D.C. 1984) (quoting 3 K.

Davis, ADMINISTRATIVE LAW TREATISE § 20.02 at 56 (1958); accord Bannercraft

Clothing Co. v. Renegotiation Board, 151 U.S. App. D.C. 174, 189, 466 F.2d 345, 360

(1972), rev'd, 415 U.S. 1, 39 L. Ed. 2d 123, 94 S. Ct. 1028 (1974) (recognizing

irreparable injury standard, but finding that no such injury existed in that case)).

See Construction Industries of Massachusetts v. Commissioner of Labor & Industries,

406 Mass. 162, 167 (1989) (declaratory relief appropriate when controversy centers

around authority and power of agency, citing Ciszewski v. Industrial Accident Bd., 367

Mass. 135, 141 (1975); Belfer v. Building Comm'r of Boston, 363 Mass. 439, 442

(1973)).

> Both the inadequacy and unavailability exceptions are relevant in a case such as
> this where the movant alleges imminent danger of irreparable harm and seeks
> emergency relief not available from the administrative forum. Administrative
> remedies need not be pursued if the litigant's interests in immediate judicial
> review outweigh the government's interests in the efficiency or administrative
> autonomy that the exhaustion doctrine is designed to further.

District of Columbia v. Group Ins. Admin., 633 A.2d 2, 20-21 (D.C. 1993) (quoting

McCarthy v. Madigan, 117 L. Ed. 2d 291, 112 S. Ct. 1081, 1087 (1992) (quoting West v.

Bergland, 611 F.2d 710, 715 (8th Cir. 1979), cert. denied, 449 U.S. 821, 66 L. Ed. 2d 23,

101 S. Ct. 79 (1980))).

> In particular, the Supreme Court observed in McCarthy that the interests of a
> party in obtaining prompt judicial review may weigh heavily against requiring
> administrative exhaustion in situations where, even though "the administrative
> decisionmaking schedule is otherwise reasonable and definite, a particular
> plaintiff may suffer irreparable harm if unable to secure immediate judicial
> consideration of his [or her] claim." 112 S. Ct. at 1087; see also 5 Jacob A. Stein,
> et al., ADMINISTRATIVE LAW, § 49.02 [2], at 49-50 (1993). For instance, in Bowen
> v. City of N. Y., 476 U.S. 467, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986), the
> Supreme Court held that a federal district court did not err in allowing persons
> who had not exhausted their administrative remedies to challenge the denial of
> disability benefits to them. Otherwise, the Court observed, "the claimants in this

case would be irreparably injured were the exhaustion requirement now enforced against them." Id. at 483.

Group Ins. Admin, 633 A.2d at 21.

As the Plaintiffs will demonstrate upon an evidentiary hearing, the unfair and irreconcilable rulemaking promulgated by the Defendant all but now precludes each Reserve Officer from the performance of his or her duties. Testimonial evidence will be offered that the offending rulemaking has directly impacted the number of hours of service provided to the District of Columbia and that continued performance of duties whatsoever in the future may be predicated upon the vacation of the unlawful rulemaking. Reserve Officers are a uniquely dedicated group of citizens who offer extraordinary services to the city for free which many other citizens would be unwilling to do for *any* amount of pay. If the Defendant continues to berate and abuse them in this manner, it is an absolutely reasonable conclusion that many Reserve Officers will leave for other volunteer opportunities elsewhere and not return again. Beyond any loss to the individual Reserve Officers of the experience and personal fulfillment they receive from serving, the District as a whole suffers an irreparable harm by the loss of these extraordinary and irreplaceable civil servants.

**4.    The unfortunate case of Johnson v. Williams.**

The Defendant offers the unpublished opinion in Johnson v. Williams, 887 A.2d 1027 (D.C. 2005) in support of his contention that the Plaintiffs and the other members of the proposed Plaintiff class have no vested rights of procedural due process in disciplinary matters. Docket #13. The Johnson case does not justifiably support this contention. The District of Columbia Court of Appeals finding in that case was in fact,

corrupted by a fraud perpetrated by the Defendant's counsel upon those courts. In the course of the Johnson case, staff attorneys of the Office of the Attorney General purposefully withheld key controlling provisions of D.C. Code from consideration of the courts, otherwise unknown to the non-attorney, *pro se* litigant Johnson, and in doing so, violated their ethical duties of candor to the court.

However, the Johnson case is an excellent demonstration that, contrary to the Defendant's assertions (Docket #10 at 3), the Plaintiffs' concerns of arbitrary or abusive removal from office by the Defendant are not speculative and are indeed well supported. This Court has superior authority to the District of Columbia courts in arbitration of individual civil rights and should disregard the holding in Johnson for these reasons.

### a. The Johnson case is not good law. Its holding is the result of a fraud perpetrated by the Attorney General upon the District of Columbia Court of Appeals.

James Johnson was a Reserve Officer.[6]  Johnson was dismissed from the Reserve Corps on May 17, 2002.[7]  He was not given a trial board or other hearing prior to his dismissal.[8]  Johnson sued in Superior Court, claiming that he was denied disciplinary due process rights afforded to him under the Metropolitan Police Department General

---

[6] Pl.s' Ex. D ¶¶ 1, 10, Pl.s' Ex. E ¶¶ 1, 10.
[7] Pl.s' Ex. D ¶ 12, Pl.s' Ex. E ¶ 12.  Neither this counsel nor the Plaintiffs have personal knowledge of the events alleged to be related to the dismissal of Johnson.  Johnson's *pro se* Complaint (Pl.s' Ex. D) is unfortunately bereft of any narrative relating to the events of January 21, 2000 which the Defendants identified as the date of the alleged incident causing Johnson's dismissal.  The appeal briefs and the written opinions of the trial and appellate courts offer no facts regarding any alleged misconduct by Johnson.  A reading of the record including the interrogatories and production of documents offers some information which this counsel has attempted to summarily reconstruct as follows:  Johnson was on duty and on patrol with an unidentified full-time officer.  The full-time officer initiated a traffic stop for reasons not given in the record.  The motorist stopped identified himself as a friend of the Chief of Police and later made a formal complaint about the stop to MPD.   The complaint identified the full-time officer, not Johnson, as the offender.  Johnson was subsequently terminated for "Failure to obey orders or directives issued by the Chief of Police" without further specification.  *See generally* Pl.s' Ex. G at 7.
[8] Pl.s' Ex. D ¶ 16.

Orders.[9]  In defending the lawsuit the Attorney General claimed that "Johnson had no

protected legal interests in his reserve officer position invoking his constitutional right of

due process."  Pl.s' Ex. G at 4.

> …it is well settled that the requirements of procedural due process apply only to
> the deprivation of protected property and liberty interests.  To have a protected
> property interest in a public employment position, an individual must have more
> than a personal need or desire for it; rather he must have a claim of entitlement for
> it; and such claims of entitlement are created and defined by state law.

Id. at 6.

> …volunteer service within the District of Columbia government is governed by
> personnel regulations promulgated pursuant to the Volunteer Services Act of
> 1977.  See D.C. Official Code, § 1-319.02 (2001) [formerly codified at D.C.
> Code, § 1-305 (1981)]; 6 DCMR, §§ 4000, et seq. (1982), 29 D.C. Reg 5405
> (December 10, 1982).  Under these regulations, an individual serves with a
> District government agency in a volunteer capacity solely at that agency's
> discretion; and the agency's termination of a volunteer's services is not
> considered an adverse personnel action and does not give rise to any right or
> process of appeal.  See 6 DCMR, §§ 4000.12 and 4000.13.

> Under this statutory and regulatory framework, volunteer employees such as Mr.
> Johnson plainly have no protected property interest regarding continued service
> within the District government, and their termination from such government
> service does not entitle them to any procedural due process.

Id. at 7-8.  The Attorney General's argument therefore, was that a District of Columbia

municipal regulation provides that volunteers in general operate solely at an agency's

discretion and *no other operative law provides for any due process rights for Reserve*

*Officers*.

Receiving no substantive rebuttal from Johnson, The D.C. Court of Appeals

accepted this argument and opined:

> We affirm essentially for the reasons stated by Judge Weisberg in his written
> opinion…  In his pro se brief, appellant relies, as he did at the trial court, on rights
> to notice and a hearing which asserts are granted to him by an MPD General
> Order governing the Reserve Corps.  While the General Order does, itself,

---

[9] Id.

provide for a hearing to contest an adverse action (stating, more precisely, that when "termination is proposed… an adverse action hearing *may* be held")… (emphasis added), the General Order must yield to the terms of the statute or regulations governing volunteer services, and the regulations expressly deny "any right or process of appeal" to a volunteer whose services have been discontinued. 6 DCMR § 4000.13; *id*. § 4000.12…

Docket #13 at 1-2.[10]

However, another law within the D.C. Code specifically afforded Johnson the right to a hearing prior to his removal from the Metropolitan Police Department. D.C. Code § 5-127.01 states, *inter alia*:

…no *person* shall be removed from said police force except upon written charges preferred against him in the name of the Chief of Police of said police force to the trial board or boards hereinafter provided for and after an opportunity shall have been afforded him of being heard in his defense;

[emphasis added]. It is important to note that this code section appears in Subchapter XIV, "General Powers and Duties" and not within Subchapter III, "Personnel". The provisions for the Reserve Corps, D.C. Code § 5-129.51, appears in Subchapter XV-B, "Reserve Corps". It is immediately evident by the broad and all-encompassing language employed by D.C. Code §5-127.01, that section covers all *persons*, not just employees or personnel, within the police force and that such code section is definitively applicable to Reserve Officers. Further, D.C. Code is superior to any municipal regulation and this section is controlling, not the DCMR referenced by the Defendants above.

In terms of government volunteers, Reserve Officers are unique to the District of Columbia. No other volunteer position known to this counsel has nearly the same commitment and demands of training and performance. The Reserve Officer appointment and training process can literally take years to accomplish. No other

---

[10] This ECF entry repeats the page numbers for the attached opinion. This citation refers to the opinion itself.

volunteer position in the District involves the level of public trust, competence and discretion that is required of an unpaid police officer. As with any public office, the Reserve Officer's discretion to perform law enforcement duties must be free of any undue influence which would permit favoritism, prejudice or abuse. Once a Reserve Officer makes this huge commitment of time to become a member of the Reserve Corps and given the public's trust, such office should not be taken away at the whim of one person. Contrary to the unfounded assertions of the Defendant, any removal from a position of public trust such as a Police Officer carries a stigma upon one's career that cannot ever be erased. *See i.e.* 6 Va. Admin. Code 20-171-450(B)(2) (an applicant with prior law enforcement experience is eligible for a training waiver if "such employment was not terminated due to misconduct or incompetence".)

The Defendant circumvented the disciplinary process required under D.C. Code § 5-127/01 to retaliate against Johnson, apparently for participating in a lawful traffic stop. No allegation of Johnson's misconduct, had there been any specified, would withstand scrutiny in a trial board as it is apparent that nothing happened to the full-time officer who was afforded such protection. Had Johnson engaged in some specific malfeasance on January 21, 2000 which could be substantiated, would not this allegation appear somewhere in the record in support of the District's claims?

Once aggrieved, Johnson took it upon himself to seek redress from the courts. His choice to do so without the benefit of counsel was a mistake fatal to his case. His lack of litigation skill or knowledge of the law is evident in each of the documents he drafted within the record and this record offers repeated instances of serious procedural errors by Johnson which contributed to the failure of his cause. Nevertheless, the

Attorney General had an absolute duty to "disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel [or more importantly, a non-attorney *pro se* litigant] and known to the lawyer to be dispositive of a question at issue and directly adverse to the position of the client". D.C. R. PROFESSIONAL CONDUCT 3.3(a)(3).

The Attorney General cannot now suggest that D.C. Code § 5-127.01 does not afford due process rights to any person within the police force, or that Reserve Officers are not "persons" for the purposes of District of Columbia law. However, in litigating against a *pro se* plaintiff ignorant of the law, it was simply too easy and too convenient to omit this citation from all of the Defendants' briefs and argument in order have Johnson's case quickly dismissed. *See* Pl.s' Ex. G at ii. By the members of the Office of the Attorney General committing this fraud upon the courts, the courts never considered the application of this code section to Johnson's case and unknowingly dealt him a gross injustice. Those attorneys who omitted this code section from the <u>Johnson</u> case committed a serious ethical violation, a violation which is now perpetuated by the Defendant's present counsel offering the case to this Court as good law. This Court should permit this injustice to go no further.

### b.  The Federal Courts have supremacy in arbitration of civil rights.

This Court should not defer to the District's courts in determining Reserve Officers' civil rights under District of Columbia law. Arguably, the highest purpose and duty of the Federal courts is to provide a neutral, expert forum wherein citizens of the United States may seek to secure their federal civil rights against unlawful state action.

Courts within the District of Columbia are established pursuant to the D.C. Court Reform and Criminal Procedures Act of 1970, D.C. Code § 11-101, *et seq*. "[T]he Court Reform Act unequivocally distributed the 'judicial power in the District of Columbia' between the federal courts and the District of Columbia courts, allotting to each its own sphere and making neither subservient to the other." M.A.P. v. Ryan, 285 A.2d 310, 313 (D.C. 1971). "The aim of the Act was to establish 'a Federal-State court system in the District of Columbia analogous to court systems in the several States.'" Key v. Doyle, 434 U.S. 59, 64 (1978) (quoting H.R. Rep. No. 91-907, p. 35 (1970)). Congress intended "to establish an entirely new court system with functions essentially similar to those of the local courts found in the 50 States of the Union with responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction." Doyle, 434 U.S. at 67 (quoting Palmore v. United States, 411 U.S. 389, 409 (1973)).

Accordingly, the District of Columbia Court of Appeals is the final word on matters of common law, Rogers v. Ingersoll Rand Co., 144 F.3d 841, 843 (D.C. Cir. 1998), and the local United States District Court must not exercise "state court jurisdiction." Coll v. Coll, 690 F. Supp. 1085, 1089 (D.D.C. 1988). However, "the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit . . . are constitutional courts manned by Art. III judges to which the citizens of the District must or may resort for consideration of those constitutional and statutory matters of general concern which so moved the Court in [O'Donoghue v. United States, 289 U.S. 516 (1933)]." Palmore, 411 U.S. at 407; D.C. Code § 11-101(1)(B), (C).

In O'Donoghue, the Supreme Court forcefully declared that District of Columbia residents are entitled, as of right, to access an Article III court , as opposed to a mere Article I court (such as the D.C. Superior Court and Court of Appeals), to resolve constitutional questions:

> It is important to bear constantly in mind that the District was made up of portions of two of the original states of the Union, and was not taken out of the Union by the cession. Prior thereto its inhabitants were entitled to all the rights, guaranties, and immunities of the Constitution, *among which was the right to have their cases arising under the Constitution heard and determined by federal courts created under, and vested with the judicial power conferred by, Art. III.* We think it is not reasonable to assume that the cession stripped them of these rights, and that it was intended that at the very seat of the national government the people should be less fortified by the guaranty of an independent judiciary than in other parts of the Union.

O'Donogue, 289 U.S. at 540 [emphasis added].

The Johnson case is bad law, and the Plaintiffs are plainly entitled to procedural due process under D.C. Code § 5-127.01.  It would be inappropriate and unfair to the Plaintiffs for this Court to permit the Defendant to deprive the District's Reserve Officers of these vested rights when doing so is absolutely contrary to the applicable statutes and contrary to the public's interest.

**5.    Conclusion.**

The liberty interests of Reserve Officers to organize for collective bargaining and their vested property interests in procedural due process in disciplinary matters are clearly established.  The Defendant's infringement upon the legislative function of the City Council by attempting to rewrite D.C. Code applicable to these officers is plainly unlawful.  This Court is the best qualified to declare the rights and legal authority of all Reserve Officers and to enjoin the Defendant from further unlawful conduct.  For these

reasons, such reasons set forth in the Plaintiffs' applications for emergency injunctive

relief, and for such other reasons as the Court finds to be good and sufficient cause, the

Defendant's Motion to Dismiss should be DENIED.

Respectfully Submitted,

_____
Matthew August LeFande
DC Bar #475995
1001 Sixteenth Street NW
Washington DC 20036-5701
Tel: (202)737-5350
Fax: (202)318-8019
email: matt@lefande.com
Attorney for the Plaintiffs