UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MPD RESERVE OFFICERS, et al.**<br><br>                                **Plaintiffs**<br><br>**v.**<br><br>**CHARLES RAMSEY**<br><br>                                **Defendant** | Case Number:<br>1:06CV01223HHK<br><br>Judge Henry H. Kennedy, Jr. |

**PLAINTIFFS' BRIEF IN REPLY
TO THE DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, by counsel, reply to the Defendant's Opposition to their Motion for Partial Summary Judgment.

The Plaintiffs have established that the Defendant maintains an official policy which deprives them of constitutionally-protected rights. Contrary to the Defendant's unfounded assertions, the Plaintiffs do not seek to enjoin the lawful administration or supervision of the Reserve Corps as already provided by, and within the scope of, District of Columbia law. However, the Defendant should be prohibited from engaging in legislative activity inappropriate to an executive branch of government. The Defendant offers no evidence that any Reserve Officer waved any due process rights otherwise guaranteed under District of Columbia law and the Constitution. Administrative regulations generally applicable to volunteers cannot negate Reserve Officers' blanket rights of due process contained within the D.C. Code necessary to maintain the impartiality and integrity of public policing. The Defendant has alleged no material

factual issue in contention which precludes summary adjudication in favor of the Plaintiffs.

> **1.  The Plaintiffs have plainly established that the Defendant maintains an official policy which deprives them of constitutionally-protected rights.**

It is undisputed that the Defendant's new General Order prohibits the Plaintiffs and the proposed Plaintiff class from organizing for collective bargaining.  The Defendant has unequivocally asserted that the Plaintiffs have no right thereto.  Docket # 23 at 7 ("Count I of the Complaint asserts, correctly, that the new General Order does not permit Reserve Officers to organize for collective bargaining purposes.")  The Defendant attempts to make an irrelevant distinction by claiming that this General Order is not an administrative regulation and that General Orders do not have the force and effect of law.  Id. at 12, Docket # 11 at 9.[1]  Under 42 U.S.C. §1983, it is not necessary to prove that a law inflicts the injury complained of, only that the deprivation was caused by government policy made "by its lawmakers or *by those whose edicts or acts may fairly be said to represent official policy*".  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)[emphasis added].

While such causes often amount to a "failure" to train or supervise, *see* City of Canton v. Harris, 489 U.S. 378, 390, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989), the present case involves an express affirmative act by the Defendant.  The terms of the Defendant's policy cannot be distilled into a more concise and explicit form; proving his intent to make the deprivation requires no inference by the reader or extraneous evidence

---

[1] While the Defendant later omitted this prohibition from his emergency and proposed rulemaking, it remains in full force and effect within the new General Order.  Pl.s' Ex. A at 4.

in support. The policy is condoned and supported by the continued advocacy of the District of Columbia's Attorney General and therefore, also by the Chief Executive he represents. The deprivation of the Reserve Officers' right to organize for collective bargaining is undisputedly the ongoing official policy of the District of Columbia government.

This Court now may make a determination of law as to whether such policy amounts to an actionable deprivation of the Plaintiffs' rights under 42 U.S.C. §1983. In support thereof, the Plaintiffs have cited competent and controlling authority that fundamental rights of free speech and free association are inherent in collective bargaining. Docket # 19 at 26-28 (quoting Thomas v. Collins, 323 U.S. 516, 89 L.Ed 430, 65 S.Ct. 315 (1945)). The Defendant's counsel appears to have some confusion over the Plaintiffs' characterization of First Amendment rights as "liberty interests". Counsel seems to mistakenly believe that liberty interests are only implicated in due process deprivations under the Fifth Amendment. *See* Docket # 11 at 3.

> In Plaintiffs' view, this is a deprivation of a liberty interest in that it amounts to a deprivation of constitutional rights of free speech and free association. (Thus, Count I is actually an attempt to state a claim under the First Amendment, not a liberty claim under the Fifth Amendment.)

Docket # 23 at 7. The Defendant's counsel is mistaken in his tangential and otherwise irrelevant semantic argument. The term "liberty interest" does not necessarily implicate a due process violation. City of Chi. v. Morales, 527 U.S. 41, 54 n.19, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). Liberty interest generally refers to any of the "liberties guaranteed by the first eight amendments of the United States Constitution." BLACK'S LAW DICTIONARY, 6th Ed. 918. This cause of action is correctly characterized as a deprivation of the Plaintiffs' liberty interests.

3

To contest the competent authority offered by the Plaintiffs supporting their implication of liberty interests in collective bargaining, the Defendant's counsel offers an argument that can be characterized as disturbing at best.  The Defendant now asserts that collective bargaining is somehow inherently evil, that the Supreme Court outlawed the practice over a century ago and that, despite the express ruling to the contrary in Thomas v. Collins, there is no fundamental right to collective bargaining and any instance thereof requires express permission by statute.

> Plaintiffs point to no authority, because there is none, for the proposition that organization for collective bargaining is a constitutionally protected right.  In fact, it is not.  See In re Debs, 158 U.S. 564 (1895), treating labor organization for collective purposes as a conspiracy.

Docket # 23 at 8.

Aside from now ignoring the Supreme Court's controlling Thomas case twice quoted at length by the Plaintiffs and repeatedly relied upon by the D.C. Circuit in recent history, the Defendant now offers a contradictory argument that can only be analogous to offering Dred Scott v. Sanford, 60 U.S. (19 How.) 393 (1857) to refute a citation to Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686; 98 L. Ed. 873 (1954) while ignoring any subsequent controlling authority.  Like Dred Scott, Debs is an obsolete artifact of American jurisprudence "whose holding and rationale [the U.S. Supreme Court has] since repudiated." Young v. United States, 481 U.S. 787, 819, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987) (Scalia, J., concurring).  *See also* Illinois v. Allen, 397 U.S. 337, 352-353, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); Bloom v. Illinois, 391 U.S. 194, 208, 20 L. Ed. 2d 522, 88 S. Ct. 1477 (1968).

The Supreme Court's examination of the history of American labor relations law following Debs in the context of a First Amendment claim in BE&K Constr. Co. v.

4

NLRB, 536 U.S. 516, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002) is very useful to the

present discussion in explaining the impropriety and irrelevance of the Debs decision.

> Throughout the 19th century, courts had upheld prosecutions of unions as criminal conspiracies. C. Tomlins, THE STATE AND THE UNIONS 36-45 (1985). They had struck down protective labor legislation -- for, say, shorter working hours or better working conditions. W. Forbath, LAW AND THE SHAPING OF THE AMERICAN LABOR MOVEMENT 38, and n. 7 (1991) (by 1900, courts had struck down roughly 60 labor laws, and by 1920, roughly 300). They had granted injunctions against employees and labor unions that weakened the unions' ability to organize. Id., at 61-62 (conservatively estimating at least 4,300 injunctions issued in labor conflicts between 1880 and 1930). And in the process they had reinterpreted federal statutes that Congress had not intended for use against the organizing activities of labor unions. *See, e.g.*, In re Debs, [*supra*] (applying Interstate Commerce Act of 1887 to union activities); Loewe v. Lawlor, 208 U.S. 274, 52 L. Ed. 488, 28 S. Ct. 301, 5 Ohio L. Rep. 617 (1908) (applying Sherman Act); *see generally* F. Frankfurter & N. Greene, THE LABOR INJUNCTION (1930).
>
> Congress initially passed the Clayton Act, 15 U.S.C. §§ 12-27, 44 to prevent employers from using the law, particularly antitrust law, in this way. In doing so, Congress hoped to "substitute the opinion of Congress as to the propriety of the purpose [of union activities] for that of differing judges" who were "prejudicial to a position of equality between workingman and employer." Duplex Printing Press Co. v. Deering, 254 U.S. 443, 485, 65 L. Ed. 349, 41 S. Ct. 172, 18 Ohio L. Rep. 366 (1921) (Brandeis, J., joined by Holmes and Clarke, JJ., dissenting). When the Clayton Act proved insufficient, Congress passed the Norris-LaGuardia Act, 29 U.S.C. § 101, which made the labor injunction unlawful. *See* United States v. Hutcheson, 312 U.S. 219, 235, 85 L. Ed. 788, 61 S. Ct. 463 (1941) ("The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction"); *see also* Marine Cooks v. Panama S. S. Co., 362 U.S. 365, 369, 4 L. Ed. 2d 797, 80 S. Ct. 779 n. 7 (1960) (enactment of Norris-LaGuardia "was prompted by a desire . . . to withdraw federal courts from a type of controversy for which many believed they were ill-suited"). Similar objectives informed Congress' later enactment of the NLRA, which took from the courts much of the power to regulate "the relations between employers of labor and workingmen" by granting authority to an administrative agency. Duplex Printing, supra, at 486 (Brandeis, J., dissenting); *see* Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965) (Goldberg, J., dissenting) (describing how Justice Brandeis' dissent in Duplex Printing "carried the day in the courts of history" when Congress passed Norris-LaGuardia and the NLRA).

BE&K, 536 U.S. at 542-543 (Breyer, J., joined by Stevens, Souter and Ginsburg, JJ., concurring).

The Defendant's suggestion that Congress' prolonged effort to protect collective bargaining from inappropriate and abusive interference by biased courts as described above somehow now requires such bargaining to have express statutory authority is unfounded and remains in conflict with the controlling opinion in Thomas.  As the Supreme Court held in BE&K, prior restraint of First Amendment rights, even within the statutory scheme of the NLRA or the Sherman Act, cannot be tolerated.

> The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." We have recognized this right to petition as one of "the most precious of the liberties safeguarded by the Bill of Rights," United Mine Workers v. Illinois Bar Ass'n, 389 U.S. 217, 222 (1967), and have explained that the right is implied by "the very idea of a government, republican in form," United States v. Cruikshank, 92 U.S. 542, 552, 23 L. Ed. 588 (1876).
>
> We have also considered the right to petition when interpreting federal law… We based our interpretation in part on the principle that we would not "lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights, such as the right to petition.  Id., at 138…
>
> We thus made explicit that "the right to petition extends to all departments of the Government," and that "the right of access to the courts is . . . but one aspect of the right of petition." Id., at 510.

BE&K, 536 U.S. at 524-525.

The Defendant claims that no freedom of speech deprivation is implicated by his prohibition against organizing for collective bargaining.  Freedom of speech, freedom of association and freedom of assembly are all inherent in such activity.

> Initially, we agree that Carter and Denson, as federal employees, have a constitutionally protected right to join the Union implied from the freedom of assembly clause in the first amendment. Greminger v. Seaborne, 584 F.2d 275, 278 (8th Cir. 1978); Norbeck v. Davenport Community School District, 545 F.2d 63, 67 (8th Cir. 1976), *cert. denied*, 431 U.S. 917, 53 L. Ed. 2d 227, 97 S. Ct. 2179

6

> (1977); American Federation of State, County & Municipal Employees v. Woodward, 406 F.2d 137, 139 (8th Cir. 1969). That right would be meaningless unless we also recognized the employees' right to participate in union activities; in addition, some participation in union activities might be protected as traditional speech without regard to the freedom of assembly clause. In any event, we hold that these individuals clearly allege conduct which violates the constitutional protections of union membership and participation.

Carter v. Kurzejeski, 706 F.2d 835, 838 (8th Cir. 1983). *See also* Steadman v. Governor, United States Soldiers' and Airmen's Home, 918 F.2d 963, 967-968 (D.C. Cir 1990); Shrum v. City of Coweta, 449 F.3d 1132, 1138-1139 (10th Cir. 2006) (quoting Morfin v. Albuquerque Public Schools, 906 F.2d 1434, 1439 (10th Cir. 1990) ("[t]he unconstitutionality of retaliating against an employee for participating in a union [is] clearly established")); Labov v. Lalley, 809 F.2d 220, 222-223 (3d Cir 1987)("[p]lainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action"); Connecticut State Federation of Teachers v. Board of Education Members, et al., 538 F.2d 471, 478 (2d Cir. 1976)("the First Amendment's speech and associational rights extends [sic] to labor union activities. Thomas v. Collins, [*supra*]; Thornhill v. Alabama, 310 U.S. 88, 84 L. Ed. 1093, 60 S. Ct. 736 (1940); American Federation of State, County, and Municipal Employees v. Woodward, 406 F.2d 137 (8th Cir. 1969); McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968).") *But see* Fraternal Order of Police v. Ocean City, 916 F.2d 919, 922 (4th Cir. 1990) (First Amendment guarantees a group's right to organize, but there is no affirmative obligation of the government to listen to or recognize collective bargaining).

**2.    The Plaintiffs do not seek to enjoin the lawful administration or supervision of the Reserve Corps as provided by law.  The Defendant should however, be prohibited from engaging in legislative activity inappropriate to an executive branch of government.**

For the Defendant, the limitations upon his office inherent in our system of government are completely misunderstood. The Chief of Police is a functionary of the executive branch of the District of Columbia government.  His mission is (or was) to implement the law which the legislature enacts, subject to the interpretation of the judiciary.  The Chief of Police has no authority to legislate.  *See* Docket #19 at 21-25.  The Defendant cannot seem to distinguish between the promulgation of "internal guidelines" (Docket #11 at 3) necessary for the administration of the police department and the Reserve Corps *within existing law*, and the creation of new law from whole cloth completely outside the lawful legislative processes.

> …Plaintiffs seek to enjoin the government from now or ever issuing rules or regulations regarding the Metropolitan Police Department Reserve Corps…

Docket # 23 at 1.

The MPD Reserve Corps requires rules and regulations.  The Plaintiffs *desire* appropriate rules and regulations for their program.  This counsel drafted proposed regulations and offered them to the District shortly after the Reserve Corps legislation was enacted.  The Mayor chose not to accept them and then failed to make any alternative regulations within the time period authorized by the City Council.  Inside of this time limitation or out, the Mayor and the Defendant *never* had the authority to engage in rulemaking which invaded the legislative function, whether expressly published in the D.C. Register or in the guise of "internal guidelines".

8

The 1995 Reserve Corps General Order (Pl.s' Ex. B) is a good, if perhaps not necessarily perfect, example of how such internal guidelines should co-exist within the limitations of District of Columbia Code and the Municipal Regulations. The Defendant questions why the Plaintiffs did not protest the lack of notice and comment provisions at the time of the promulgation of the 1995 Order. Docket # 23 at 12.  The answer is simple.  The 1995 General Order did not attempt to legislate.  It was not administrative rulemaking.  It was, more or less, harmonious with existing law.   Notice and comment requirements with the District of Columbia Administrative Procedures Act were inapplicable.  The 1995 General Order had none of the provisions which the Plaintiffs now complain about in the 2006 version (Pl.s' Ex. A).  The drafters of the 1995 Order did not interject quasi-statutory definitions of Reserve Officers where none previously existed in the law.  The 1995 Order does not prohibit Reserve Officer conduct that is otherwise authorized or required under existing law.

As an example, under the 2006 Order, Reserve Officers' right to a trial board prior to termination is expressly denied:

> Notwithstanding any other provision of this General Order, all Reserve Corps members shall serve at the pleasure of the Chief of Police, who shall, without limitation, have the authority to determine when to reduce a Reserve Corps member in rank or Level and remove a Reserve Corps member from the Reserve Corps.  Such determination shall not be subject to administrative review.

Pl.s' Ex. A at 6.

This provision conflicts with D.C. Code § 5-127.01 ("no person shall be removed from said police force except upon written charges preferred against him in the name of the Chief of Police of said police force to the trial board or boards hereinafter provided for and after an opportunity shall have been afforded him of being heard in his defense",

9

*see* Docket # 19 at 28-31) and 6A DCMR § 1000.2 ("No member of the force (except probationers) shall be dismissed from office except upon written charges preferred against him or her in the name of the Chief of Police and after an opportunity shall have been afforded him or her of being heard in his or her defense.")

To the contrary, the 1995 General Order performed the proper function of a rule or regulation, to clarify the application of the existing law to circumstances specific to the Reserve Officers.

> To every extent practicable and appropriate, Reserve Corps members shall be subject to the responsibilities and procedures outlined in General Order 1202.1 (Disciplinary Procedures and Processes) and as further modified by this order.

Pl.s' Ex. B. at 20 [paragraph enumeration omitted].

> Adverse Actions, as defined by General Order 1202.1, may be taken by the Patrol Services Officer upon receiving a disciplinary report and recommendation from a commanding officer.

Id. at 21.

> The Patrol Services Officer shall issue the affected Reserve Corps member a Notice of Proposed Adverse Action citing the member with the appropriate charge(s) and identifying the act involved.
>
> The Reserve Corps member shall also be informed of his/her right to answer the charge(s) in writing.

Id.

> In cases where termination is proposed or at the discretion of the Patrol Services Officer, an adverse action hearing may be held before a hearing board appointed by the Patrol Services Officer, to make recommendations to the Patrol Services Officer subject to review by the Chief of Police, if applicable.

Id. at 21-22.

Reserve Officer Johnson's fatal error in Johnson v. Williams, 887 A.2d 1027 (D.C. 2005) (and the Attorney General's corresponding ethical lapse), was to fail to

inform the Courts in his case of the underlying law affording disciplinary due process to any member of the Metropolitan Police Department.[2] General Order 101.3 did not provide Officer Johnson with a right to due process under law. That right came from D.C. Code § 5-127.01 and 6A DCMR § 1000.2. The 1995 General Order 101.3 appropriately served only to clarify the application of an existing right under District of Columbia law. The Defendant now offers an argument in his defense correctly stating that the General Order should not be treated as a law, but yet identical offending passages appear within his emergency and proposed rulemaking and he maintains the new General Order as the official policy of the department.

    **3.**    **Administrative regulations regarding volunteers cannot negate blanket rights of due process contained within the D.C. Code.**

If the Plaintiffs demonstrate District of Columbia law entitles them to a hearing prior to removal from MPD, they have made a threshold showing that they have a legitimate property interest subject to constitutional protection. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972); <u>District of Columbia v. Jones</u>, 442 A.2d 512, 516 (D.C. 1982). D.C. Code § 5-127.01 provides "no person shall be removed from said police force except upon written charges preferred against him in the name of the Chief of Police of said police force to the trial board or boards hereinafter provided for and after an opportunity shall have been afforded him of being heard in his defense". There can be no question that if this provision of District of Columbia law is

---

[2] In Reserve Officer cases prior to <u>Johnson</u>, the Defendant's counsel expressly conceded their right to due process. *See* Pl.s' Ex. I.

11

applicable to the Plaintiffs, they have a protected property interest in their continued positions with MPD.

### a. The CPMA is inapplicable to Reserve Officers and Section 5-127.01 remains operative for them.

The Defendant has previously argued that a section of District of Columbia Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.01 *et seq.*, which negates this provision for civil service police and firefighters appointed after the implementation of the CMPA is applicable to Reserve Officers.  Upon the Plaintiffs making the Court cognizant of the affirmed Superior Court opinion in LeFande v. District of Columbia, 875 A.2d 116 (2005)[3], as now relied upon by all parties in the present case (*see* Docket # 23 at 6, n. 2) and which expressly states the CMPA is not applicable to MPD Reserve Officers, the Defendant retreats to a previous insightful argument that, in essence, Reserve Officers are not "persons" for the purpose of District of Columbia law. *See* Id. at 10-11.

More troubling than this patently offensive argument is the Defendant's suggestion that it was the responsibility of the Johnson court "in own its [sic] research or analysis" to discover that the Attorney General had unethically and purposefully withheld controlling authority from the court's consideration in defending against the claims of *pro se*, non-attorney plaintiff Johnson.  Id. at 10.  Perhaps as well in the present case, the Defendant hoped the Plaintiffs would not ever bring the LeFande opinion to this Court's attention.

---

[3] The Defendant cites an erroneous date for this decision.

12

### b. The alleged Volunteer Services Agreement offered by the Defendant does not constitute a waiver of any Reserve Officer's legal rights.

The Defendant now offers as an exhibit, an unauthenticated document he purports to be a Volunteer Services Agreement signed by Plaintiff Griffith.[4] As a contractual instrument, the alleged agreement is grossly defective for the purpose it is offered by the Defendant. Even if the Plaintiffs wave the issue of its authentication for the limited purpose of summary adjudication, the document on its face fails to state that Plaintiff Griffith waived any of his constitutional, statutory or common law rights.

The Declaration of Volunteer begins by stating, "I hereby agree to donate my service to the D.C. government in performing the duties described above." No service, no duties, no duty location, no supervisor, and no title are described anywhere within the document, these sections are simply blank.[5] There is no mention of the word "Reserve Officer" anywhere in the document. This counsel has personally served the District Columbia as a volunteer Emergency Medical Technician, an Officer of the D.C. Department of Health and as a volunteer prosecutor for the then Office of Corporation Counsel, none of which were subject to the statutory due process provisions under D.C. Code § 5-127.01. It remains unclear as to whether this document has any relation to Plaintiff Griffith's duties as a Reserve Officer or some other volunteer position, and the fact that the Defendant has failed to produce an analogous document for Plaintiff Kim reinforces this concern.

---

[4] It is reasonable to surmise that the Defendant has no analogous agreement for Plaintiff Kim. Plaintiff Kim joined MPD some ten years after Plaintiff Griffith, yet the Defendant fails to offer any agreement alleged to be signed by Kim.

[5] Irrespective of the personal information later redacted from the Defendant's exhibit. *See* Docket # 26.

13

The agreement makes no mention that Plaintiff Griffith could be terminated from the Reserve Corps, or any other volunteer position, without cause. The only "termination" mentioned refers to the ambiguous agreement itself, not any position with the government. The District of Columbia Personnel Manual cited by the Defendant and mentioned in the document cannot override the rights of due process provided to any person provided in D.C. Code § 5-127.01 or any inalienable rights contained within the Constitution. The Defendant falsely claims that D.C. Code § 1-319.05(2) addresses the status of Reserve Officers. Docket # 23 at 5. It does not.[6] Instead, the section contains a generic definition of "volunteer" which the Defendant wishes the Court to now shoehorn all Reserve Officers into without further qualification, regardless of the unique nature of their positions within the District government and absent any evidence that the personnel regulations cited by the Defendant contemplated the government's employment of Reserve Officers.

### c. Section 5-127.01 reinforces a public policy that all police officers be free of political coercion in the performance of their discretionary police duties.

Guarantees of disciplinary due process for police officers contained within D.C. Code § 5-127.01 and its functional counterparts within the DCMR, the CMPA, MPD General Order 1202.1 and police collective bargaining agreements exist because of the strong public interest in maintaining the impartiality of police officers. Throughout history, due process in disciplinary matters has played a critical role in the reform and de-politicization of public policing. Starting in Scotland at the end of the 18th Century, the

---

[6] There is no mention of Reserve Officers whatsoever within the entire title, the District's Personnel Manual or the Volunteer Services Act (6 DCMR § 4000 *et seq.*).

English speaking world began to implement highly regulated and disciplined municipal police programs derived from what began as less effective privately funded systems of night watchmen.

> Watchmen and Patroles, instead of being, as now of comparatively of little use, from their age, infirmity, inability, inattention, or corrupt practices, might almost at the present expence, by a proper selection, and a more correct mode of discipline, by means of a general superintendance over the whole to regulate their conduct, and keep them to their duty, be rendered of great utility in preventing Crimes, and in detecting Offenders.

P. Colquhoun, A TREATISE ON THE POLICE OF THE METROPOLIS, 7th Ed. (1806) 106 [emphasis and footnote omitted]. The first evident success was Sir Robert Peel's London Metropolitan Police Department in the early part of the 19th Century, upon which the District of Columbia's MPD was later patterned. Early police departments in Boston, New York and Philadelphia suffered from vast corruption and ineffectiveness, in part due to political patronage systems controlling their respective police forces.

> London's officers were civil servants created by the British Constitution, sworn to keeping peace by peaceful means. The U.S. Constitution, in contrast, makes no explicit mention of police. Police departments in the United States hired their officers locally through a system of ward bosses operating under mayoral patronage. Municipal police in the United States operated with considerably more informal discretion and less formal authority than Peel's officers. They were not given the training, effective supervision, *or job security* that were part and parcel of policing in London's MPD. They were typically dismissed when their ward chief or mayor failed to win reelection. Both systems were public and the officers uniformed, but the systems differed dramatically from one another in effectiveness and legitimacy.

B. Forst, "The Privatization and Civilianization of Policing", 2 CRIMINAL JUSTICE 2000 28 [emphasis added].

Starting in 1894, the New York State Senate began investigating police corruption in New York City. The committee discovered city police involvement in extortion, bribery, counterfeiting, voter intimidation, election fraud, and brutality, and

15

recommended major reforms to the department. M. Johnson, STREET JUSTICE, A HISTORY OF POLICE VIOLENCE IN NEW YORK CITY (2003) 52. Theodore Roosevelt was appointed president of the New York City Police Commission the following year. T. Roosevelt, AN AUTOBIOGRAPHY (1913) IV:1. Roosevelt was largely responsible for shifting the New York City Police Department away from a political patronage system and creating a civil service system more consistent with the principles previously espoused by Peel.

> The first fight I made was to keep politics absolutely out of the force; and not only politics, but every kind of improper favoritism. Doubtless in making thousands of appointments and hundreds of promotions there were men who contrived to use influence of which I was ignorant. But these cases must have been few and far between. As far as was humanly possible, the appointments and promotions were made without regard to any question except the fitness of the man and the needs of the service.

Id. at 12.

By requiring an officer not to be removed from a police force but for legitimate cause, whether it be a member of the civil service or a volunteer, the officer is insured that he will not suffer undue repercussions for the legitimate performance of his discretionary police duties. This need distinguishes Reserve Officers from any other type of volunteer public servant the District of Columbia employs and justifies the due process requirements of D.C. Code § 5-127.01, *et al.*[7] There has never been an instance of a removal of an MPD Reserve Officer *without cause*. Not once in its history has MPD suggested that it has too many Reserve Officers or that a need for Reserve Officers no longer exists. However, as in the Johnson case, Reserve Officers have been repeatedly removed for causes *that can not be lawfully justified*. The Defendant's demand that

---

[7] The Defendant points out "Section 5-127.01 was enacted in 1901" (Docket # 23 at 10), contemporaneous with the advent of American policing reform as herein described.

Reserve Officers be denied any due process furthers his intention to insulate his own unlawful and inappropriate conduct from public scrutiny.

The Defendant wishes to return the District of Columbia and MPD back to a dark age of political favoritism and patronage which has no place in our modern era. Indeed, Officer Johnson complained that he was terminated for the lawful stop of one of the Defendant's cronies. Johnson was terminated without further cause and the termination upheld without further justification. This was a significant step backward in the ongoing endeavor to reform and modernize the Metropolitan Police Department. Further efforts to remove procedural safeguards protecting the impartiality and apoliticality of MPD's officers should not be tolerated by this Court. Considering Officer Johnson's experience and the Defendant's stated intentions, a Reserve Officer's fear of an unjustified removal from MPD remains far from speculative. Further, it cannot be held to be in the public interest to have two sets of police officers within MPD, one with civil service tenure operating under rules of law and procedure and another force in identical uniforms entirely consisting of politically connected citizens operating solely under the Mayor's patronage, regardless of their qualifications, competence or integrity. If the Reserve Corps is to remain a viable and legitimate entity, it requires freedom from undue political influence.

**4.      The Defendant alleges no material factual issue remains in contention which precludes summary adjudication in favor of the Plaintiffs.**

The Defendant's "Statement of Defendant of Material Facts as to which there is a Genuine Issue" (Docket # 23, Attachment 2) amounts to no more than a reiteration of the Defendant's arguments of law. Nowhere within this document or the Defendant's

17

response to the Plaintiffs' Statement of Material Facts (Attachment 1) does there exist any contention of a material fact which precludes summary adjudication in favor of the Plaintiffs.

The Defendant's conclusory statement that Reserve Officers are not "sworn officers" is contradicted by his own claims within the new General Order and his emergency and proposed rulemaking.  *See* Pl.s' Ex. A at 12-13 (A Reserve Officer Level II is authorized to "appear before courts and administrative tribunals as a sworn officer." A Reserve Officer Level I is authorized to "[p]erform all of the duties and responsibilities of a sworn officer." "When a Reserve Corps member is the arresting officer, the Reserve Corps member shall be responsible for papering the case, and for all subsequent court appearances associated with the arrest.")  *See also* Id. at 18-19 (on-duty Reserve Corps members shall "be held to the same duty obligations as a sworn officer, including the duty to make arrests for crimes committed in their presence, the duty to take appropriate police action when required, and the duty to comply with all laws, regulations, Department directives, and lawfully issued orders.")  To suggest that Reserve Officers are not sworn, but then order them to represent themselves otherwise before a court is to suborn perjury.  The Defendant cannot turn the Plaintiffs' "sworn" status on and off as he pleases.  The mechanics of District of Columbia law do not afford him this option.

> Members of the force shall be held to be always on duty, although periodically relieved from the routine performance of it; shall always be subject to orders from the proper authorities and to call from citizens; and the fact that they may be technically off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring that action.

6A DCMR § 200.4.  *See also* D.C. Code § 5-115.03 (criminal penalty for any member of the police force to neglect to make arrest for offense committed in presence).

The Defendant's present suggestion that Reserve Officers are not "sworn" is no more than an opportunistic misrepresentation immediately impeached by his own prior statements. No further judicial inquiry is required to refute this nonsensical assertion.

**Conclusion**

Turning around an old maxim to fit the instant case, the Plaintiffs properly assert "with responsibilities, come rights." As evidenced by the Defendant's own prior statements, the Plaintiffs perform the same duties of Metropolitan Police Officers, albeit without pay. To suggest that, because they perform their duties as a public service and not as a vocation, they should receive <u>less</u> protection from coercion and other undue influence in the performance of their duties is to do a great disservice to these citizens and to unnecessarily compromise an invaluable public resource.

There being no material factual issue in dispute, the Plaintiffs are now entitled to a judgment as a matter of law. This Court should enjoin the Defendant from promulgating or enforcing any rule which attempts to "define the scope of Reserve Corps members' authority and discretion in carrying out their duties and responsibilities, including any limitations on or restrictions to their authority and discretion" and any rule which improperly deprives the Plaintiffs of rights otherwise afforded under applicable law.

November 29, 2006

    Respectfully Submitted,


    _____
    Matthew August LeFande
    DC Bar #475995
    1001 Sixteenth Street NW
    Washington DC 20036-5701
    Tel: (202)657-5800
    Fax: (202)318-8019
    email: matt@lefande.com
    Attorney for the Plaintiffs